UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ANNE M. LECOIN-SUPPLICE,                           :
                                                   :
                              Plaintiff,           :
                                                   :         **MEMORANDUM & ORDER**
            -against-                              :         13-CV-2851 (DLI)
                                                   :
CAROLYN W. COLVIN,                                 :
Acting Commissioner of Social Security,            :
                                                   :
                              Defendant.           :
-----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

On November 3, 2005, Plaintiff Anne M. Lecoin-Supplice ("Plaintiff") filed an application for Social Security disability insurance benefits ("DIB") under the Social Security Act (the "Act"), alleging disability beginning on August 16, 2002. (*See* Certified Administrative Record ("R."), Dkt. Entry No. 23 at 157-59.) Her application was denied and she timely requested a hearing. (R. 46.) On May 11, 2007, Plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge Katherine Edgell ("ALJ Edgell"). (R. 466-86.) By a decision dated May 25, 2007, ALJ Edgell concluded Plaintiff was not disabled within the meaning of the Act. (R. 48-56.) Plaintiff requested review of the decision by the Appeals Council (R. 75.), which remanded the claim for further proceedings (R. 76-79.)

On March 13, 2008, Plaintiff appeared with counsel and testified at a hearing before Administrative Law Judge Marilyn Hoppenfeld ("ALJ Hoppenfeld"). (R. 487-537.) By a decision dated July 24, 2008, ALJ Hoppenfeld found Plaintiff not disabled. (R. 57-72.) On September 4, 2008, Plaintiff requested review of the decision by the Appeals Council. (R. 100.) Additionally, Plaintiff filed a second DIB application with an alleged onset date of July 25, 2008, which was granted on October 31, 2008. (R. 112.) On August 10, 2009, the Appeals Council

issued a decision reopening the favorable decision on the DIB application with the alleged onset date of July 25, 2008, combining that claim with the earlier claim, and remanding both for additional proceedings. (R. 119-22.) On March 12, 2010, Plaintiff appeared with counsel at a second hearing before ALJ Hoppenfeld to address the issues remanded by the Appeals Council on the consolidated claims. (R. 538-619.) By a decision dated May 25, 2010, ALJ Hoppenfeld found Plaintiff not disabled.[1] Plaintiff requested review of the decision by the Appeals Council. (R. 126-27.) On July 27, 2011, the Appeals Council remanded Plaintiff's consolidated claim for additional proceedings. (R. 137-40.)

On January 3, 2012, Plaintiff appeared with counsel at her fourth hearing and testified before Administrative Law Judge Hazel Strauss ("ALJ Strauss"). (R. 620-712.) By a decision dated July 19, 2012, ALJ Strauss found Plaintiff not disabled. (R. 11-33.) Plaintiff requested that the Appeals Council review ALJ Strauss's decision. (R. 9.) However, on March 18, 2013, ALJ Strauss's decision became the Commissioner's final decision when the Appeals Council declined to review the decision. (R. 3-5.)

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. § 405(g). (*See* Complaint ("Compl."), Dkt. Entry No. 1.) Plaintiff moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. (*See* Pl.'s Mem. in Supp. of Mot. for J. on the Pleadings ("Pl. Mem."), Dkt. Entry No. 18.) The Commissioner cross-moved for judgment on the pleadings and opposed Plaintiff's motion. (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 20.) For the reasons set forth

---

[1]  Both parties have acknowledged that this decision is not part of the record. Neither party provided an explanation for its absence.

2

below, Plaintiff's motion is granted in part and the Commissioner's motion is denied. This action is remanded to the Commissioner for additional proceedings.

## BACKGROUND

A.  **Non-Medical and Self-Reported Evidence**

Plaintiff was born in 1951 and was 51 years old on the alleged onset date. (R. 625.) She attended one year of college. (*Id*.) Prior to her alleged onset date, she had a long career with the Federal Reserve Bank of New York, working as a help desk representative, an administrative assistant, and an administrative clerk. (R. 659-74.)

Plaintiff became injured, and thus, unable to work, after a motor vehicle accident in August 2002. (R. 477.) Initially, she missed four to five months of work due to the injuries she sustained to her neck and back. (R. 479.) She returned to work for approximately two to three weeks and was offered a buyout. (R. 479, 660.) She has not worked since then.

On May 11, 2007, at her first hearing, Plaintiff testified that she could stand, walk or sit up to fifteen minutes at a time and that she needed to change positions frequently. (R. 484.) On March 13, 2008, at her second hearing, Plaintiff testified that she could walk up to ten blocks and stand for up to ten minutes, but that she was in constant pain. (R. 508.) She was able to sit for up to fifteen to twenty minutes. (R. 509.) She was unable to carry a gallon of milk without experiencing pain and complained of pain upon bending. (R. 483, 508.) She indicated that her medications were effective at decreasing her pain only occasionally and she only took them every couple of days because they upset her stomach. (R. 629.)

Plaintiff indicated that she rested in bed some days due to her pain. (R. 480.) On a typical day, she prepared breakfast and attempted a walk in the park. (*Id*.) On her doctor's recommendation, she walked in a swimming pool for exercise. (R. 481.) She attended massage

3

therapy every week. (*Id.*) At the time of her first hearing, she indicated that she did not drive. (*Id.*) At the time of her second hearing, she indicated that she drove occasionally, but usually got rides from her friends or her husband. (R. 494-95.) She cooked "once in a while." (R. 482, 513.) She did not perform household chores and a friend helped her with shopping. (R. 512-13.) Her husband helped her get dressed and shower. (R. 573, 578.) She travelled to her home in Florida in 2009. (R. 559.)

**B.**     **Medical Evidence**

   **1.   Medical Evidence from the Relevant Period (August 16, 2002 - December 31, 2008)**

On August 16, 2002, Plaintiff was taken to an emergency room after being rear-ended in a motor vehicle accident. (R. 273.) She complained of neck pain, was diagnosed with neck strain, and released that day. (R. 272.) On September 11, 2002, Plaintiff underwent magnetic resonance imaging ("MRI") of her cervical spine, which revealed disc bulges at the C4-C5 and C6-C7 levels. (R. 278.) On September 13, 2002, she underwent an MRI of her lumbar spine, which revealed herniated discs at the L3-L4 and L4-L5 levels, as well as a broad-based disc bulge at the L3-L4 level. (R. 232.)

On October 8, 2002, Rajpaul Singh, M.D., a neurologist, examined Plaintiff. (R. 279.) Plaintiff complained of headaches, neck and back stiffness, neck pain radiating to her right shoulder, low back pain radiating to her thighs, and difficulty bending and lifting objects. (*Id.*) Dr. Singh diagnosed Plaintiff with cervical and lumbosacral spine sprain and strain and radiculopathy at the L4-L5 level. (R. 282.) He noted that her injuries may result in a permanent reduction in the normal range of motion of the lumbosacral spine, and chronic pain and compromised performance of ordinary functions. (R. 283.) Her prognosis was "guarded." (*Id.*)

On October 21, 2002, Howard Balensweig, M.D., an orthopedist, examined Plaintiff. (R. 285-88.) Plaintiff complained of pain in her neck, stiffness and pain with bending to the right, pain on extension of the trunk, soreness at the L4-L5 and L5-S1 levels, arthritis in the ankles, pain in the left knee with straight-leg raises, and tenderness in the buttocks, left thigh, and calves. (*Id*.) Dr. Balenweig opined that it was premature to estimate the permanency of Plaintiff's neck symptoms, but noted that Plaintiff was "quite disabled." (R. 287-88.)

On November 26, 2002, Jean-Robert Desrouleaux, M.D., a neurologist, examined Plaintiff. (R. 360.) She reported that her symptoms had worsened. (*Id*.) On examination, she had positive straight-leg raises in the left leg and diminished sensation in the left leg and foot. (R. 361.) Dr. Desrouleaux diagnosed Plaintiff with radiculopathy at the L5 level and multiple herniated discs and prescribed anti-inflammatory medications. (*Id*.) On November 26, 2002, Dr. Desrouleaux cleared Plaintiff to return to work on December 3, 2002. (R. 233.)

On January 21, 2003, Plaintiff reported no improvement with respect to her pain and symptoms. (R. 365.) Five months later, on May 27, 2003, Dr. Desrouleaux examined her, finding positive straight-leg raises and decreased sensation for the left leg. (R. 365-66.)

On January 29, 3003, Gerard Varlotta, D.O., a physiatrist, examined Plaintiff for her complaints of neck and back pain. (R. 289.) He diagnosed Plaintiff with cervical and lumbar facet syndrome secondary to the motor vehicle accident. (*Id*.) He prescribed an anti-inflammatory medication and a muscle relaxer, and recommended physical therapy. (*Id*.) She continued to treat periodically with Dr. Varlotta. (R. 367-68.) On October 2, 2004, Plaintiff underwent an electromyography and nerve conduction study that revealed L5 radiculopathy. (R. 362-64.)

On April 22, 2005, Plaintiff returned to Dr. Desrouleaux complaining of back pain radiating to her left leg and neck pain radiating to both arms. (R. 372.) She indicated that her symptoms were more severe. On examination, Plaintiff's left straight-leg test was positive, her sensation in the left leg was decreased, and her gait was mildly antalgic. (R. 373.) Dr. Desrouleaux diagnosed Plaintiff with left L5 radiculopathy and lumbar disc herniation. (*Id*.) He opined that Plaintiff was "permanently disabled." (*Id*.) Dr. Desrouleaux noted similar findings after examining Plaintiff on March 14, 2006 and October 17, 2006. (R. 369.)

On January 3, 2006, Plaintiff underwent an x-ray which found "no bony or disc space pathology," and that the "[l]ordotic curve is straightened." (R. 240.)

Additionally, on January 3, 2006, Steven Calvino, M.D., an internist, examined Plaintiff at the request of the agency. (R. 236-39.) Plaintiff stated that she cooked twice weekly, but was unable to perform household chores or shopping. (R. 237.) Dr. Calvino noted that Plaintiff was in no acute distress. (*Id*.) Her gait and station were normal and she walked without a cane or walker. (*Id*.) Her grip strength was normal. (*Id*.) She had full flexion, extension, lateral flexion, and rotary movements in the cervical, thoracic, and lumbar spine, as well as bilateral full range of motion in her shoulders, elbows, forearms, wrists, and fingers. (R. 237-38.) She had no muscle atrophy or joint inflammation, effusion or instability. (R. 238.) There was positive tenderness to palpation in the bilateral lumbosacral region. (*Id*.) Straight-leg tests were negative. (*Id*.) She had full range of motion in her hips, knees, and ankles, and demonstrated no atrophy, sensory abnormality, joint effusion, inflammation or instability. (*Id*.) Dr. Calvino diagnosed Plaintiff with mechanical low back pain. (*Id*.) He opined that she was mildly restricted from heavy lifting, frequent bending, squatting or carrying. (*Id*.) She had "no

restrictions for standing, walking, sitting, or fine motor activities of the bilateral upper extremities." (*Id.*)

On January 24, 2007, Dr. Desrouleaux examined Plaintiff regarding her complaints of difficulty moving her left upper extremity, severe limited range of motion for her neck, and back pain that radiated to her left leg. (R. 374.) On examination, she exhibited a severe restriction of the range of motion in her neck, difficulty abducting the left arm, positive straight-leg test for the left leg, decreased sensation in the left arm and left leg, and a mildly antalgic gait. (R. 375.) Dr. Desrouleaux indicated that Plaintiff would have difficulty lifting any objects heavier than fifteen pounds with her left arm, difficulty walking on stairs, difficulty sitting for more than fifteen minutes, and difficulty with walking generally. (*Id.*) He opined that she was permanently disabled. (*Id.*) On March 28, 2007, Plaintiff complained of neck and back pain and an "electrical feeling" in her neck radiating to the fingers in her left hand and lumbosacral pain radiating to her left leg. (R. 376.) Dr. Desrouleaux indicated that Plaintiff had difficulty performing basic household chores. (R. 377.) The same restrictions for activity were present. (*Id.*) Again, he opined that she was permanently disabled. (*Id.*)

On March 29, 2007, Efsathia Chiopelas, M.D., a rheumatologist, examined Plaintiff for complaints of diffuse arthralgias and neck pain. (R. 262.) Dr. Chipelas diagnosed Plaintiff with arthralgia, myalgia, elevated C-reactive protein, and neck and back pain. (R. 263.) She prescribed Celebrex. (R. 264.) On April 25, 2007, Dr. Chiopelas provided a letter stating that she had treated Plaintiff for years for diffuse arthralgias and that Plaintiff was attending physical therapy to improve her symptoms. (R. 266.)

On April 26, 2007, Dr. Desrouleaux submitted a medical source statement in which he indicated that Plaintiff was limited to sitting for up to four hours total, standing and/or walking

7

for up to two hours total, and occasionally lifting and/or carrying up to twenty pounds during an eight-hour workday. (R. 250-51.) She had limitations with respect to reaching, pushing, and pulling. (R. 251.) Furthermore, Dr. Desrouleaux indicated that Plaintiff could only occasionally engage in climbing, balancing, stooping, crouching, kneeling, and crawling. (*Id*.) On May 1, 2007, Dr. Desrouleaux examined Plaintiff, opining that she was totally and permanently disabled. (R. 267-69, 379-80.) On June 27, 2007, he reached similar findings. (R. 380.)

On September 15, 2007, Plaintiff underwent an MRI of her lumbar spine, which revealed multilevel degenerative changes, a bulging disc at L4-L5 touching the exiting right L4 nerve root, and a bulging disc at L3-L4 with mass effect on the exiting left L3 nerve root. (R. 304-05.) Later that month, Dr. Desrouleaux noted bilateral positive straight-leg raises and an antalgic gait, diagnosing Plaintiff with multilevel lumbosacral disc herniation, left L5 radiculopathy, and cervical and lumbar myofascitis. (R. 382.)

On October 26, 2007, Plaintiff underwent an electromyography and nerve conduction study, which revealed left L5 and S1 radiculopathies. (R. 383-85.)

Plaintiff continued to treat with Dr. Desrouleaux, who maintained his opinion that she was totally and permanently disabled. (R. 293-94, 299-300, 391-94.)

2. **Medical Evidence after Plaintiff's Date Last Insured (December 31, 2008)**

On June 25, 2009, Mohamed Nour, M.D., an orthopedic surgeon, examined Plaintiff. (R. 318-23.) He diagnosed Plaintiff with chronic cervical sprain/strain post trauma, lumbar disc herniation, and internal derangement of the left hip, knee, and ankle. (R. 323.) He opined that she was "totally and permanently disabled." (*Id*.) In addition to his notes, he prepared a Spinal Impairment Questionnaire ("Questionnaire"). (R. 311-17.) In the Questionnaire, Dr. Nour diagnosed Plaintiff with chronic cervical syndrome and herniated lumbar discs. (R. 311.) He

reported finding limited range of motion, tenderness, muscle spasm, sensory loss, reflex changes, muscle atrophy, and muscle weakness in the cervical and lumbar spines, as well as abnormal gait, lumbosacral trigger points, and bilateral positive straight-leg raises. (R. 311-12.) Plaintiff's primary symptoms were pain, loss of sensation, and fatigue. (R. 313.) Dr. Nour indicated that Plaintiff was limited to sitting for up to one hour total, standing/walking for up to one hour total, and occasionally lifting and/or carrying up to ten pounds during an eight-hour workday. (R. 314-15.) He noted that she would be unable to engage in pushing, pulling, bending, kneeling, and stooping on a sustained basis. (R. 317.) He opined that her impairments would cause her to be absent from work more than three times monthly. (R. 316.) Dr. Nour concluded that her symptoms and limitations had been present since August 16, 2002. (R. 317.)

On October 27, 2009, Aric Hausknecht, M.D., a neurologist, examined Plaintiff. (R. 329-33.) Dr. Hausknecht reviewed the records and reports of Drs. Desrouleaux, Chiopelas, and Nour, and examined Plaintiff. He diagnosed Plaintiff with lumbosacral derangement with multiple disc protrusions and associated left radiculopathy at the L4-L5 level. (R. 325.) He noted that her subjective complaints were supported by the findings of his examination and opined that she was totally disabled from all forms of employment, including sedentary work. (R. 333.) Additionally, Dr. Hausknecht completed a Spinal Impairment Questionnaire containing similar findings and opinions. (R. 334-40.) Notably, he indicated that her work restrictions had been present since August 16, 2002.

On February 11, 2010, Plaintiff indicated that her symptoms had worsened. (R. 395.) Dr. Desrouleaux reported that she had difficulty standing, walking, bending, sitting for prolonged periods, performing household chores, carrying objects weighing more than fifteen to twenty pounds, and walking up and down stairs. (R. 396.)

9

On March 12, 2010, at Plaintiff's hearing, medical expert John Axline, M.D., an orthopedic surgeon, testified that Plaintiff's impairment did not meet or equal a per se disabling Medical Listing. (R. 582, 591.) Dr. Axline testified that there was no medical evidence in the record to support the opinion that Plaintiff could not stand and walk for six hours during an eight-hour workday. (R. 592.) Dr. Axline testified that Plaintiff "couldn't have trouble at the L4-L5 disc or L5-S1 disc" and that although she may have had nerve involvement, it could not have been at the L5-S1 nerve because "there is no such nerve." (R. 585.) He disputed the validity of the findings regarding a neurological deficit involving the left ankle. (R. 591.) Dr. Axline opined that for the period prior to December 31, 2008, Plaintiff's date last insured, Plaintiff was able to perform light work. (R. 593.)

On June 1, 2010, Plaintiff underwent an MRI of her lumbar spine, which revealed a broad based disc herniation at L4-L5 with right L5 nerve root impingement, a small disc protrusion at L3-L4, and degenerative changes at the L3-L4 and L4-L5 levels. (R. 456-57.)

On July 15, 2010, Plaintiff underwent lumbar decompression surgery with laminectomy and microdiscectomy at the right L4-L5 level, performed by John Bendo, M.D. (R. 438-39.)

On August 24, 2010, Donald Goldman, M.D., an orthopedic surgeon, examined Plaintiff. (R. 432.) Upon examination and review of her medical records, he opined that Plaintiff was permanently disabled from any kind of employment, and that her disability was due to her motor vehicle accident in 2002. (R. 436.) Additionally, he completed a Spinal Impairment Questionnaire. (R. 425-31.) He diagnosed Plaintiff with status post lumbar spine surgery, status post multilevel herniated discs, and lumbar radiculopathy. (R. 425.) On examination, he found limited range of motion and tenderness in the lumbar spine, sensory loss, reflex changes, muscle atrophy, muscle weakness in the left leg, abnormal gait, lumbosacral trigger points, and positive

bilateral straight-leg raises. (R. 425-26.) He noted that diagnostic testing supported these findings. (R. 427.) He found that Plaintiff was limited to sitting for up to four hours, talking for up to two hours, and occasional lifting during an eight-hour workday. (R. 428-29.) He recommended that she refrain from pushing, pulling, bending, kneeling, and stooping on a sustained basis. (R. 431.) These limitations had been present since 2002-2003. (*Id*.)

On December 6, 2011, Dr. Desrouleaux completed a Multiple Impairment Questionnaire. (R. 443-50.) His diagnoses, findings, and opinions were comparable to those contained in his prior reports.

On January 3, 2012, at Plaintiff's hearing, medical expert Louis Fuchs, M.D., an orthopedic surgeon, testified that, although Plaintiff's injury caused nerve damage, Plaintiff's impairments did not meet any Medical Listing prior to December 31, 2008, her date last insured, because during that period there is no documentation of consistent muscular weakness, atrophy, reflex deficits or sensory impairments. (R. 645, 648-50.) Based on a review of the medical records, he opined that Plaintiff could lift objects weighing five pounds frequently, ten pounds occasionally, and that Plaintiff would be able to stand for at least thirty to forty minutes for up to two hours, sit for thirty minutes at a time for up to four to six hours during a work day. (R. 646-48.) She should avoid extreme cold and vibrations. (R. 648.)

On January 11, 2012, Dr. Desrouleaux submitted a letter indicating that Plaintiff's symptoms had been present since her accident on August 16, 2002, and worsened before her surgery in 2009. (R. 460.) He indicated that he had treated Plaintiff on a quarterly basis since 2002 for chronic back pain radiating to her left leg. (R. 462.) He reiterated that Plaintiff has been unable to perform competitive work on a regular basis since August 2002. (R. 464-65.)

C.  **Vocational Expert ("VE") Testimony**

At the January 3, 2012 hearing, the VE considered a hypothetical individual of Plaintiff's age, education, and work experience who was limited to sedentary work and walking six blocks at a time, sitting for thirty minutes at a time for up to six hours total, standing for thirty to forty-five minutes at a time for up to two hours total, lifting and carrying up to five pounds frequently and ten pounds occasionally, occasionally bending, no squatting, and no exposure to extreme cold or vibration. He testified that someone with those restrictions could perform Plaintiff's past relevant work as a help desk representative and administrative assistant, as well as other sedentary work. (R. 675-78, 687-705.) Additionally, he testified that, if sitting was limited to four hours per shift, that four hours plus two hours of sitting or standing would result in a six-hour work day, and that "some jobs are actually performed at six hours and are considered full-time jobs, but most are not." (R. 676.)

## DISCUSSION

A.  **Standard of Review**

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human*

*Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999) (quotations omitted).

**B.    Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as

well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education and work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("the Listings"). *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. § 404.1520(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

**C.     The ALJ's Decision**

On July 19, 2012, ALJ Strauss issued a decision denying Plaintiff's claim. (R. 11-33.) ALJ Strauss followed the five-step procedure in making her determination that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), and, therefore, was not disabled. (R. 18-32.) At the first step, ALJ Strauss determined that Plaintiff had not engaged in

14

substantial gainful activity since August 16, 2002, the alleged onset date, through December 31, 2008, the date last insured. (R. 16.) At the second step, ALJ Strauss found one severe impairment: lumbosacral disc disease. (R. 17.) At the third step, ALJ Strauss concluded that Plaintiff's impairment did not meet or equal a Medical Listing. (*Id*.)

At the fourth step, ALJ Strauss found that Plaintiff could perform sedentary work as defined in 20 CFR § 404.1567(a). (R. 18-32.) The ALJ found that Plaintiff was able to perform her past relevant work as a help desk representative and an administrative clerk as that work did not "require the performance of work-related activities precluded by the claimant's residual functional capacity." (R. 32-33.) In so concluding, the ALJ found that the evidence established that Plaintiff "can walk up to 6 blocks at a time, sit for 30 minutes at a time and for a total up to 6 hours in an 8-hour day; stand for 30 to 45 minutes at a time and for a total of 2 hours in an 8-hour day; and lift or carry 10 pounds occasionally and 5 pounds frequently." (R. 18.) Plaintiff "must change her position . . . as needed" and that she "can bend occasionally but is unable to squat." (*Id*.) Finally, Plaintiff "has environmental limitations to avoid extremes of cold, as well as vibrations." (*Id*.) ALJ Strauss did not proceed to the fifth step because she found Plaintiff not disabled at step four.

**D.    Analysis**

Plaintiff moves for judgment on the pleadings, seeking reversal and remand for calculation of benefits. (*See Generally* Pl. Mem.) The Commissioner cross-moves for judgment on the pleadings, seeking affirmation of the denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to determine that Plaintiff was not disabled and that the factual findings are supported by substantial evidence. (*See generally* Def. Mem.)

### 1. Unchallenged Findings

The ALJ's findings as to steps one and two are unchallenged. Upon a review of the record, the Court concludes that the ALJ's findings at steps one and two are supported by substantial evidence.

### 2. Medical Listing

ALJ Strauss concluded that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments." (R. 17.) She evaluated Plaintiff for Medical Listing 1.04A of the Muscuoloskeletal System listings. (*Id*.) To establish Medical Listing 1.04A, a plaintiff must demonstrate:

> Disorders of the spine (*e.g.*, herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture,) resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raises (sitting and supine).

Medical Listing 1.04A.

In reaching the conclusion that there was insufficient evidence to establish Medical Listing 1.04A, ALJ Strauss relied on testimony from medical experts Drs. Axline and Fuchs. (R. 17.) Dr. Axline testified that, to the extent Plaintiff sought to establish Medical Listing 1.04A by nature of a compromised nerve root, she could not establish nerve root damage at the L4-L5 or L5-S1 levels because no such nerve exists at those levels. (R. 585.) Plaintiff disputes this finding, contending that such a nerve exists and that the ALJ erred in relying on Dr. Axline's flawed testimony. (Pl. Mem. at 21.) Further, it appears that there was diagnostic evidence

indicating some level of nerve root damage. (R. 304-05, 383-85.) ALJ Strauss relied on Dr. Axline's testimony, but did not explain why his testimony was given greater weight on this particular issue than Plaintiff's treating physicians. Moreover, ALJ Strauss did not reconcile this testimony with the diagnostic evidence that appears to indicate nerve root damage.

In finding that there was insufficient evidence of the "A" criteria, ALJ Strauss relied on testimony from Dr. Fuchs. Dr. Fuchs testified that, although Plaintiff experienced some of the "A" criteria at various times, there was no documentation of Plaintiff experiencing all of the symptoms consistently. (R. 645, 648-50.) Plaintiff contends that Dr. Fuchs' opinion is contrary to the evidence provided by her treating physicians. (Pl. Mem. at 17-18.) Indeed, there is significant evidence of Plaintiff's symptoms or "A" criteria in the record. Although ALJ Strauss provides extensive analysis of the medical evidence and the weight assigned to each physician during her analysis of Plaintiff's RFC, she does not offer such an explanation regarding the issue of whether or not Plaintiff satisfies Medical Listing 1.04A.

Without a clearer explanation as to how the ALJ reached the conclusion on this issue, it is improper for the Court to affirm that portion of ALJ Strauss's decision. *See, e.g.*, *Martinez v. Colvin*, 2014 WL 4391878, at *9 (S.D.N.Y. Sept. 4, 2014) ("The ALJ must discuss the 'the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence.'" (quoting *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)). Accordingly, under these circumstances, remand is appropriate.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is denied and Plaintiff's motion is granted to the extent that this action is remanded for additional proceedings in accordance with this Opinion pursuant to the fourth sentence of 42 U.S.C. § 405(g).  Specifically, ALJ Strauss is to explain why she gave greater weight to two experts as opposed to the treating physicians and why Plaintiff does not satisfy Medical Listing 1.04A.

SO ORDERED.

Dated: Brooklyn, New York
      March 5, 2015

                                      /s/
                            DORA L. IRIZARRY
                          United States District Judge